Michael KAHUMOKU, Plaintiff,

v.

TITAN MARITIME, LLC and
American Marine Corpo-
ration, Defendants.

American Marine Corporation, Cross-
claimant & Cross Defendant,

v.

Titan Maritime, LLC, Cross-claimant
& Cross Defendant.

Titan Maritime, LLC, Third–
Party Plaintiff,

v.

Healy Tibbits Builders, Inc and
Does 1 through 10, Third–
Party Defendants.

Civil No. 05–00207 JMS/KSC.

United States District Court,
D. Hawai'i.

Jan. 12, 2007.

Preston W. Easley, Jr., Law Offices of Preston Easley, San Pedro, CA, for Plaintiff.

James D. Boughey, Mark L. Cokee, Wilson Elser Moskowitz Edelman & Dicker LLP, Richard C. Wootton, Cox Wootton Griffin Hansen & Poulos LLP, San Francisco, CA, for Defendants.

Richard C. Wootton, Cox Wootton Griffin Hansen & Poulos LLP, James D. Boughey, Wilson Elser Moskowitz Edelman & Dicker LLP, San Francisco, CA, Tedson H. Koja, Office of Corporation Counsel, Honolulu, HI, for Cross Claimant & Cross Defendants.

James D. Boughey, Rebecca Labat Crosby, Wilson Elser Moskowitz Edelman & Dicker LLP, San Francisco, CA, for Third-Party Plaintiff.

John O'Kane, Jr., Michael D. Formby, Michael J. Nakano, Mark S. Hamilton, Frame Formby & O'Kane, Honolulu, HI, for Third-Party Defendants.

*ORDER GRANTING TITAN MARITIME'S MOTION FOR SUMMARY JUDGMENT AS TO THE PLAINTIFF'S SECOND CAUSE OF ACTION (PUNITIVE DAMAGES)*

SEABRIGHT, District Judge.

## I. INTRODUCTION

The Plaintiff, Michael Kahumoku ("Plaintiff"), was injured in the course of a marine salvage operation. The Plaintiff filed a negligence claim against Defendant Titan Maritime LLC's ("Titan") for both compensatory and punitive damages. Titan filed for summary judgment on the grounds that punitive damages are not available under 33 U.S.C. § 905(b) or, in the alternative, that the facts of the case do not sustain a claim for punitive damages. Based on the following, the motion for summary adjudication as to the Plaintiff's claims for punitive damages is GRANTED.

## II. BACKGROUND

### A. Factual Background

The 41–year–old Plaintiff brings suit for injuries he sustained on February 8, 2005 during salvage operations undertaken to save the shipping vessel the *Cape Flattery* which had run aground on a reef one mile off of Barbers Point, Honolulu Hawaii. The owner of the *Cape Flattery* hired marine salvage company Titan to conduct the salvage operation. Generally speaking, the salvage operation entailed offloading some of the *Cape Flattery's* cargo—which consisted of 53,000 tons of cement and about 117,000 gallons of fuel oil and lubricants—onto independent barges, lightening the *Cape Flattery's* weight and enabling Titan to extricate the *Cape Flattery* from the reef before ocean waves further damaged the ship or caused environmental damage.

Titan's salvage master, team of salvage engineers, naval architect, and contract administrator flew to Hawaii to oversee the *Cape Flattery* salvage operation. Titan also entered into several subcontracts with various companies for additional equipment and personnel. Titan chartered a barge crane and barges, including Barge HT–39, from Healy Tibbits Builders, Inc. ("Healy Tibbits"). Titan also contracted for several Healy Tibbits employees to work on the *Cape Flattery* salvage operation, including Plaintiff, a crane operator on crane barges and land based cranes. Titan also contracted with American Marine Corporation ("AMC") for AMC to operate tugboats to move the barges into place. Under the terms of the agreement, AMC acted as an independent contractor.

Healy Tibbits' Third Party Def. Opp. to the Facts Stated in Def. Titan's Mot. for Summ. J. Ex. 16. One of the tugboats supplied and operated by AMC was the *American Emerald,* a tugboat captained by Captain Scott Cooper ("Cooper"). At the time of his injury, the Plaintiff was riding in Barge HT–39, one of the Healy Tibbits barges bareboat chartered to Titan. Barge HT–39 was being towed into place by AMC's tugboat the *American Emerald.*

The *Cape Flattery* salvage operation was being controlled and overseen by the United States Coast Guard which formed a "Unified Command" that exercised overall authority over the endeavor. After consulting with the State of Hawaii, the owner of the *Cape Flattery,* and Titan, the Unified Command proposed an Incident Action Plan setting forth initial plans for the salvage operation. The preliminary Incident Action Plan, prepared February 4, 2005, called for the cement to be offloaded using both a barge crane and retrofitted *Cape Flattery* equipment onto two 1500 ton barges which would then haul the cement cargo away. Titan's Mot. Summ. J. Ex. B at TM0125.

Weather conditions halted the offloading on Sunday, February 6, 2005. However, on Monday, February 7, 2005, the weather forecast for the following day called for "both winds and seas to subside to lower levels bringing more favorable conditions across the area." Pl's. Resp. to Def. Titan's Concise Statement of Material Facts Ex. 4 at Ex. 9. Given this, Titan Captain and Salvage Master Richard Habib ("Habib"), who was staying on the stranded *Cape Flattery,* proposed a revised salvage

Incident Action Plan calling for the cargo to be offloaded from both the port and the starboard sides of the *Cape Flattery* starting on Tuesday, February 8, 2005. Titan's Mot. Summ. J. Ex. F at TM066; Titan's Mot. Summ. J. Ex. E at 26–27. The barge working on the starboard side of the *Cape Flattery* would be protected from the wind and ocean waves by the *Cape Flattery.* The barge working on the port or windward side, however, would be exposed to the elements of the open ocean. Habib submitted his revised salvage plan to the Unified Command, which approved the proposed course of action.

On the morning of Tuesday, February 8, 2005, Healy Tibbits Logistics Coordinator Clay Hutchinson ("Hutchinson") had a meeting with Habib aboard the *Cape Flattery.* At that time, Habib informed Hutchinson that he planned to offload cement from both sides of the ship, conditions permitting. Pl's. Resp. to Def. Titan's Concise Statement of Material Facts Ex. 4 at Ex. 7. Hutchinson, who had been observing the ocean swells the night prior and just before dawn, stated that "[t]here were 15–30 minute periods of relatively low swell conditions followed by sets of 4–5 foot swell[s]" but that "[a]t dawn the wind was calm." *Id.*

Also on the morning of Tuesday, February 8, 2005, Captain Paul Burnett ("Burnett"), the Senior Captain of AMC's tugboat the *American Contender,* rode out to the *Cape Flattery* to survey the scene. Burnett became convinced that attempting to dock a barge on the port side was unsafe due to incoming four to six foot swells. Burnett told several people, including Hutchinson[1] and Burnett's supervisor Neal Williams ("Williams"), a vice

---

1. In relevant part, the Burnett's deposition reads:

Q: What was your discussion with Clay [Hutchinson]?

A: I just felt it was unsafe. I felt somebody could get hurt easily and didn't want to do it.
Q: Did Clay tell you he would pass that on to Habib?

president of AMC, of his concerns and that, if asked, he would refuse to skipper his tug to the *Cape Flattery's* port side. Titan's Mot. Summ. J. Ex. G at 12, 21.

Following the conversation between Burnett and Hutchinson, Hutchinson met with Habib to convey Burnett's concerns. During this meeting, Hutchinson and Habib discussed the fact that swells were coming in sets every 15–30 minutes. Hutchinson claims to have told Habib that they should not moor the barges on the port side until the swells had diminished and that Cooper "would probably not be willing to take the chance anyway." Pl's. Resp. to Def. Titan's Concise Statement of Material Facts Ex. 4 at Ex. 7. Hutchinson also told Habib that he had "witnessed both Paul [Burnett] and Scotty [Cooper] maneuver barges in extremely difficult conditions" and that Hutchinson "had

great respect for [Burnett's and Cooper's] tug handling abilities and judgment." *Id.*

Following his conversation with Hutchinson, Habib telephoned Williams to discuss the proposed plan. During that phone conversation, both Williams and Habib said that Habib stated that Habib was not concerned about damage to the ship or equipment.[2] Williams and Habib did not discuss any risk of injuries to personnel. Titan's Mot. Summ. J. Ex. J at 58. The record also reflects that Williams said that his ship captains should have the authority to make the final call regarding whether to proceed, and that Habib agreed.[3] Williams claims that Habib insinuated that if AMC didn't do as Habib said, Habib was going to remove AMC from the salvage operation. Williams admits, however, that Habib never made any explicit or implied statements to this effect.[4]

---

A: I don't recall if he said that or not. He agreed with me.

Titan's Mot. Summ. J. Ex. G at 30. Hutchinson's account of this conversation is similar. In a statement prepared by Hutchinson regarding the accident, Hutchinson writes, "At about 0700 I received a cell phone call from Captain Paul Burnett of the 'American Contender.' Paul stated that putting a barge on the port side of [the] *Cape Flattery* would be unsafe. I told Paul that I agreed and would discuss Paul's concerns with Rich Habib." Pl's. Resp. to Def. Titan's Concise Statement of Material Facts Ex. 4 at Ex. 7.

2. Habib states that "the context of the discussion was about ... trying to make these captains comfortable with the fact that they were—have caused damage to the ship and were going to continue to cause damage to the ship, that that was a consequence of doing salvage out in the open ocean." Titan's Mot. Summ. J. Ex. E at 75.

Williams, in a memo prepared after his conversation with Habib, wrote that Habib explained "that my captains on the tugs assisting the M/V Cape Flattery needed to understand that he didn't care if we damaged the equipment or the ship in the process of landing barges and holding them there.... [H]e just wanted them to know that this

wasn't a normal activity and that damaging things was ok if he needed to get something done." Titan's Mot. Summ. J. Ex. I.

3. Habib states that Williams said " 'Look, I'm not going to second-guess our captains. They'll make the decision on site.' And I agreed with that.... And he [Williams] said, 'Look, I'm not going to second guess my captains.' And I said, 'I'm not either.' I said, 'Just have them come out, take a look at it.' " Titan's Mot. Summ. J. Ex. E at 74.

Williams wrote that he told Habib that "we would do everything we could to make it happen but I would not second guess my captains on-site and that they had the last call," Titan's Mot. Summ. J. Ex. I, and that Williams "wasn't going to second-guess the people that we had on station, and that our guys would go out and take a look at it; and if they felt comfortable or if they felt that it was potentially doable, that we would try it. But it would be up to them to assess those criteria. And then if he didn't like that, he could dismiss us." Titan's Mot. Summ. J. Ex. J at 39–40.

4. In relevant part, Williams' deposition testimony reads as follows,

A: ... I told [Habib] that basically he wasn't going to find anybody in the state

Following this discussion with Habib, Williams spoke with Burnett, who was serving as AMC's lead captain on the *Cape Flattery* project. Williams told Burnett that either Burnett or Cooper should "take a look at what they were being asked to do, and if they didn't feel like it was a reasonable request, that [Williams] would back them to the extent of [AMC] getting run off the job." Titan's Mot. Summ. J. Ex. J at 40–41. Burnett told Williams that his recommendation was to not attempt the landing. Titan's Mot. Summ. J. Ex. J at 41. However, Burnett and Williams agreed that AMC "would go out and take a look at it, try to size up the weather conditions at the time that this was happening, and see whether we could acquiesce" to Habib's request. Titan's Mot. Summ. J. Ex. J at 43. This plan was conveyed by both Williams and Burnett to Cooper.[5] Burnett advised Cooper that he was concerned about the high swells and for Cooper to "take a look at it" and "that it was his judgment call." Titan's Mot. Summ. J. Ex. G at 24. Both Burnett and Williams had the authority to instruct Cooper not to

attempt the port or windward side landing; neither did so. Titan's Mot. Summ. J. Ex. J at 42.

On Tuesday, February 8, 2005, Captain Cooper skippered AMC's tugboat the *American Emerald* out to site of the *Cape Flattery*. The *American Emerald* was tasked with moving Barge HT–39 into place for the salvage operations. On board the barge was an AMC relief captain and two AMC deckhands. Two Healy Tibbits employees, including the Plaintiff, were also aboard Barge HT–39.[6] No one connected with Titan had instructed Healy Tibbits to have men aboard Barge HT–39 and their presence was not part of Titan's work plan. Moreover, Plaintiff's presence on Barge HT–39 appears to be contrary to Healy Tibbits' policy against its employees riding barges in the open ocean. Titan claims that the Healy Tibbits employees were not necessary for the docking of Barge HT–39 at the *Cape Flattery*. Plaintiff, however, claims that he was to handle the mooring lines to tie the barge to the offshore side of the ship. Transportation upon the *American Emerald* was appar-

---

that would do this, other than us, any better because this is the kind of salvage work type of work we do; and that if he didn't like what we were doing ... he had the right to dismiss us at any time.
Q: Did he make any hints or threats that if you didn't do what he said, he was going to kick your company off the job?
A: No, but he insinuated that.
Q: How?
A: Just by the general tone of the discussion and that I had already seen Smith Maritime get run off the project for something that my captains felt was his responsibility.
Pl's. Resp. to Def. Titan's Concise Statement of Material Facts Ex. 6 at 69–70.

5. Williams asked Burnett to relay to Cooper that AMC "had a request from the salvage master to try to land the barge along the port side, and that they could go out and take a look at it but that they had my full support in

backing away from that if it's not something they wanted [or] though was advisable." Titan's Mot. Summ. J. Ex. J at 43. Cooper said that Williams told him that when Cooper "went out to look at it, that if it was safe, go ahead and do it. Because that's what the salvage master wanted me to do. That was the whole plan." Titan's Mot. Summ. J. Ex. H at 15. Cooper also stated that Burnett called him and told him that "don't go out and do it ... go ahead and speak up because we're all behind you; and if you don't want to do it, don't do it; and if it looks safe, go ahead and do it." Titan's Mot. Summ. J. Ex. H at 15.

6. The other Healy Tibbits employee on Barge HT–39 was Randy Kozai, a welder who had begun work only one month prior. The *Cape Flattery* salvage assignment was his first time working at sea. Titan's Mem. in Opp. to Healy Tibbits' Mot. Summ. J. Ex. L at 8, 23, 26–27.

ently not necessary for the Healy Tibbits employees since Titan had provided other transportation to the site of the salvage operation.

When Cooper's tug arrived at the *Cape Flattery,* he assessed the weather as "good," "calm," with "two to three foot swells" but "no wind."[7] Titan's Mot. Summ. J. Ex. H at 15–16. Overall, Cooper thought it was "a nice day" which was "the best day [he] had seen out there." Titan's Mot. Summ. J. Ex. H at 17. Cooper was aware that he was not required to make a landing on the port or windward side of the *Cape Flattery,* that he was to review and assess the situation, and that he was only to attempt the landing if he was willing to do so. Titan's Mot. Summ. J. Ex. H at 15–17. At the time that he made the landing, Cooper testified that there was "influence on [him]" to land the tug since "whenever you're a captain on a tug and they ask you to do something, well, [there] better be a very good reason why you can't do it." Titan's Mot. Summ. J. Ex. H at 84–85. However, Cooper admits that no one was pressuring him to do something he did not want to do and that, at the time, he did not have any reservations about attempting the landing. Titan's Mot. Summ. J. Ex. H at 15, 57–59. Cooper therefore "made the decision to try and land the barge" on the *Cape Flattery's* port or windward side. Healy Tibbits' Third Party Def. Opp. to the Facts Stated in Def. Titan's Mot. for Summ. J. Ex. 19 at AMC 0096.

According to Hutchinson, at the time Cooper began his first attempt to land the *American Emerald* off the port side of the *Cape Flattery,* "[t]he wind was calm and the swell was low." Pl's. Resp. to Def. Titan's Concise Statement of Material

Facts Ex. 4 at Ex. 7. This first attempt proving unsuccessful, Cooper repositioned his tug to make a second attempt at mooring Barge HT–39 on the port or windward side of the *Cape Flattery.* At this time, Hutchinson stated that the swells were "small." Pl's. Resp. to Def. Titan's Concise Statement of Material Facts Ex. 4 at Ex. 7. This second attempt was also unsuccessful.

When Cooper was attempting to dock the *American Emerald* for the third time, a "freak" or large swell arose, lifting Barge HT–39 and bringing it into contact with the side of the *Cape Flattery.* Titan's Mot. Summ. J. Ex. H at 59–61. When this happened, the Plaintiff fell and became entangled with a securing device at the corner of Barge HT–39. With his right leg caught in the mooring bits and vertical posts, Plaintiff slid off the side of HT–39 where he dangled upside down off the starboard side of Barge HT–39, precariously hanging between the barge and the stranded *Cape Flattery.* An AMC crew member was able to pull the Plaintiff back on board, but not before Plaintiff tore a tendon in his right knee. Cooper aborted the landing attempt and brought the *American Emerald* and Barge HT–39 back to shore. The salvage operation continued, although no further barge landings were attempted off of the port or windward side of the *Cape Flattery.* On Wednesday, February 9, 2005, the Plaintiff underwent surgery to repair the quadriceps tendon rupture in his right knee.

### B. *Procedural Background*

Plaintiff filed his original Complaint on March 24, 2005 seeking redress for his injuries. In his Third Amended Complaint, filed on December 20, 2005, Plain-

---

**7.** Cooper testified that "[t]he first thing I did was come up off the bow just out of the harbor and stood by for—I don't know how long—20 minutes possibly, and watched everything that was going on." Titan's Mot. Summ. J. Ex. H at 16.

tiff, a citizen of Hawaii, brought suit against Titan, a citizen of Florida, and AMC, a citizen of Hawaii, alleging negligence. The Plaintiff also claims punitive damages against Titan. AMC filed a cross-claim for indemnity against Titan, with Titan responding by filing a cross-claim against AMC. Titan then impleaded Healy Tibbitts, a citizen of Hawaii, as a third-party defendant.

On September 26, 2006, Titan filed a Motion for Summary Judgment, in part moving on the basis that the Plaintiff did not offer sufficient evidence to demonstrate a triable issue as to punitive damages.[8] AMC and the Plaintiff both filed oppositions to Titan's motion. Healy Tibbits filed an opposition to the facts stated in Titan's summary judgment motion. The court heard oral arguments regarding Titan's motion for summary judgment on the Plaintiff's claims for punitive damages on January 8, 2006.[9] The court's decision, as set forth below, is narrowly limited to this issue regarding the Plaintiff's claims for punitive damages against Titan.

### III. *STANDARD OF REVIEW*

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is enti-tled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

"One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses[.]" *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The burden initially lies with the moving party to show that there is no genuine issue of material fact. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n.*, 809 F.2d 626, 630 (9th Cir. 1987). Nevertheless, "summary judgment is mandated if the non-moving party 'fails to make a showing sufficient to establish the existence of an element essential to that party's case.'" *Broussard v. Univ. of Cal. at Berkeley*, 192 F.3d 1252, 1258 (9th Cir.1999) (*quoting Celotex*, 477 U.S. at 322, 106 S.Ct. 2548).

■ The court applies the substantive rules of general maritime law. "[F]ederal law, rather than state law, controls the damages issue when the cause of action arises under maritime law." *Protectus Alpha Nav. Co., Ltd. v. North Pacific Grain Growers, Inc.*, 767 F.2d 1379, 1385 (9th Cir.1985).

### IV. *ANALYSIS*

#### A. *Punitive Damages Are Available Under Admiralty Law*

■ Punitive damages are available under general maritime law. *See In re Exx-*

---

**8.** Titan also moved the court for summary judgment as to Plaintiff's negligence claims. On September 27, 2006, Healy Tibbits moved for summary judgment as to all claims brought by Titan. Titan and AMC both filed an opposition to Healy Tibbits' motion. That motion is not considered nor implicated by the court in the present opinion. The court deems these motions—including Titan's motion for summary judgment as to Plaintiff's negligence claims and Healy Tibbits' motion for summary judgment as to Titan's claims— withdrawn pending the results of court-ordered mediation. Thus, the only motion ad-dressed in this opinion is Titan's motion for summary adjudication as to Plaintiff's claim for punitive damages.

**9.** Titan also filed a Motion to Strike the Plaintiff's Jury Demand and to Dismiss Claims Based on Diversity Jurisdiction. Both motions were argued at the January 8, 2007 hearing. Ruling from the bench, the court granted Titan's Motion to Strike the Plaintiff's Jury Demand and denied Titan's Motion to Dismiss those claims brought under the court's diversity jurisdiction.

*on Valdez,* 270 F.3d 1215, 1226 (9th Cir. 2001); *see also Bergen v. F/V St. Patrick,* 816 F.2d 1345, 1348 n. 1 (9th Cir.1987) ("Whether or when punitive damages are available under the general maritime law is not entirely clear. In a maritime action that included no Jones Act claims, we held that punitive damages were available."); *Muratore v. M/S Scotia Prince,* 845 F.2d 347, 354 (1st Cir.1988) ("[P]unitive damages may be awarded in maritime tort actions where defendant's actions were intentional, deliberate or so wanton and reckless as to demonstrate a conscious disregard of the rights of others."); *CEH, Inc. v. F/V Seafarer,* 70 F.3d 694, 699 (1st Cir.1995) ("Although rarely imposed, punitive damages have long been recognized as an available remedy in general maritime actions where defendant's intentional or wanton and reckless conduct amounted to a conscious disregard of the rights of others."). The question presently before the court is whether punitive damages are available under general maritime law as modified by 33 U.S.C. § 905(b).

■ Section 905(b) is silent as to the type of damages that may be recovered; it merely states: "In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel[.]" [10] 33 U.S.C. § 905(b). By its own terms, § 905(b) does not preclude an award of punitive damages under any general maritime or admiralty law theory. Absent express language to the contrary, § 905(b) will not be deemed to eliminate a remedy otherwise available at common law. *See, e.g., Shaw v. R.R. Co.,* 101 U.S. 557, 565, 11 Otto 557, 25 L.Ed. 892 (1879) ("No statute is to be construed as altering the common law, farther than its words import"); *accord Norfolk S. R.R. Co. v. Sorrell,* —— U.S. ——, 127 S.Ct. 799, 166 L.Ed.2d 638 (2007) (finding that absent an explicit statutory alteration to the common law rule, FELA claims are determined by reference to the existing common law). Where it intends to eliminate punitive damages for tort claims, Congress specifically so provides. *See, e.g.,* 28 U.S.C. § 2674 (2007) ("The United States ... shall not be liable ... for punitive damages."). Congressional silence as to punitive damages in § 905(b) indicates Congress' intent for the remedy to remain available under maritime law.

In arguing that the court should find that § 905(b) precludes punitive awards, Titan unpersuasively cites to *Miles v. Apex*

---

10. The statute does not define "damages" available for "the negligence of a vessel" under the Act. The Act was amended in 1972 to eliminate an action based on unseaworthiness while improving the benefit structure and retaining the right to recover damages from negligence against the vessel. Congress thus eliminated the strict liability cause of action (unseaworthiness) but retained a fault-based cause of action (negligence) against the vessel. The House Report states that "nothing in this bill is intended to derogate from the vessel's responsibility to take appropriate corrective action where it knows or should have known about a dangerous condition." H.R. Rep. 92–1441 (1972), *reprinted in* 1972 U.S.C.C.A.N. 4698, 4704. Whether the vessel was negligent "can only be resolved through the application of accepted principles of tort law and the ordinary process of litigation—just as they are in cases involving alleged negligence by land-based third parties." *Id.* Congress did "not intend that the negligence remedy authorized in the bill shall be applied differently in different ports depending on the law of the State in which the port may be located.... [L]egal questions which may arise in actions brought under these provisions of the law shall be determined as a matter of Federal law." *Id.* at 4705. Because the statute does not indicate what damages are available or precluded under the statute, the court looks to the applicable federal common law.

*Marine Corp.*, 498 U.S. 19, 111 S.Ct. 317, 112 L.Ed.2d 275 (1990). Titan's reliance on *Miles'* emphasis on uniformity of damages in wrongful death actions is misplaced and not applicable to the present question. *Miles* is a case involving a Jones Act seaman—as opposed to a longshoreman—who had been stabbed to death by a fellow crew member. The Ninth Circuit has recognized that "the Court clearly rested its decision in *Miles* on the existence of the Jones Act's limitation on remedies—a limitation not present in this case." *Sutton v. Earles*, 26 F.3d 903, 919 (9th Cir.1994); *see also Mussa v. Cleveland Tankers*, 802 F.Supp. 88 (E.D.Mich.1992) (distinguishing *Miles* as case wherein Jones Act seaman sued his employer under Jones Act and general maritime law and could not recover loss of society damages, from the case at bar wherein Jones Act seaman could assert punitive damages claim against third-party non-employee under general maritime law).

Sutton, decided post-*Miles*, recognizes the continuing validity of *Sea–Land Services, Inc. v. Gaudet*, 414 U.S. 573, 94 S.Ct. 806, 39 L.Ed.2d 9 (1974), which allowed damages for loss of society for survivors of longshoremen. *Gaudet* and *Sutton* each allowed non-pecuniary damages for non-seamen injured in territorial waters. *Sutton* explains that in *Gaudet*, the Supreme Court "recognized that is was permitting recovery for damages that were not compensable under the Death on the High Seas Act." 26 F.3d at 915. The Ninth Circuit explicitly rejected the positions adopted by the Second, Fifth and Sixth Circuits, which, in the interests of uniformity, prohibit non-pecuniary damages for

non-seamen in territorial waters. Despite the anomaly between available remedies, *Sutton* concluded, "[w]e do not consider ourselves free to give such weight to the interest of uniformity, in light of *Gaudet's* explicit acknowledgment that it was creating a non-uniform category of damages in territorial waters.... Any lack of uniformity that is evidenced by our ruling inheres in the decision of the Supreme Court in *Gaudet* and in the actions of Congress in enacting the [Death on the High Seas Act] and the Jones Act." *Id.* at 917. *Gaudet's* continuing viability defeats Titan's argument that *Miles* requires uniformity of damages in territorial waters.[11] *Miles* does not prohibit the recovery of punitive damages for injury to longshoremen in territorial waters.

Because the statute does not limit the scope of damages available and because punitive damages are available under the general maritime law, the court rejects Titan's claim that punitive damages are not available to Plaintiff as a matter of law. The court concludes that punitive damages are available under § 905(b).

**B.** *The Plaintiff Has Failed to Allege Facts Sufficient for a Reasonable Factfinder to Find Titan Liable for Punitive Damages*

■ Punitive damages are not designed to compensate a plaintiff for harm that he has suffered; instead, "they are aimed at deterrence and retribution." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003). In admiralty law, punitive damages "may be imposed for conduct which

---

**11.** In fact, *Miles* recognized that the "holding of *Gaudet* applies only in territorial waters, and it applies only to longshoremen." 498 U.S. at 31, 111 S.Ct. 317. *See also Rutherford v. Mallard Bay Drilling, LLC*, 2000 WL 805230 (E.D.La.2000)("As this case presents a longshoreman injured in territorial waters, this Court is compelled to conclude that the *Miles* uniformity principle is inapplicable. Accordingly, uniformity considerations do not preclude an award of punitive damages here.").

manifests reckless or callous disregard for the rights of others or for conduct which shows gross negligence or actual malice or criminal indifference." *Churchill v. F/V Fjord,* 892 F.2d 763, 772 (9th Cir.1988) (citation and quotation signals omitted). *Royal Insurance Co. of America v. Southwest Marine,* 194 F.3d 1009, 1015 (9th Cir.1999), explains that,

> Black's Law Dictionary defines 'gross negligence' as '[t]he intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another; such a gross want of care and regard for the rights of others as to justify the presumption of willfulness and wantonness.' Black's Law Dictionary 1185 (4th ed.1968); *accord La Esperanza de P.R., Inc. v. Perez,* 124 F.3d 10, 19 (1st Cir. 1997) (defining gross negligence as 'harm wilfully inflicted or caused by gross or wanton negligence'). Case law from this circuit indicates 'gross negligence' is simply a 'point[ ] on a continuum or probability,' *Vision Air Flight Serv. Inc. v. M/V Nat'l Pride,* 155 F.3d 1165, 1176 n. 13 (9th Cir.1998), and its presence 'depends on the particular circumstances of each case.' *Todd Ship-*

*yards Corp. v. Turbine Service, Inc.,* 674 F.2d 401, 411 (5th Cir.1982).

To proceed with his punitive damages claim against Titan, the Plaintiff bears the burden of showing that there are facts sufficient to allow a reasonable trier of fact to find, by a preponderance of the evidence, that Titan acted with gross negligence, manifest recklessness, callous disregard, or criminal indifference to the Plaintiff's safety or well-being. *See In re Exxon Valdez,* 270 F.3d at 1232 ("The standard of proof generally applied in federal civil cases is preponderance of evidence. Congress has in special instances, such as habeas corpus and deportation, required proof by clear and convincing evidence, but it has not so legislated for maritime cases.").

■ Plaintiff alleges that Habib's conduct, including certain statements regarding physical damage to ships and Habib's request that Burnett and Cooper assess weather conditions and consider mooring on the port side of the *Cape Flattery,* supports a claim for punitive damages against Titan.[12] After reviewing the evidence in the light most favorable to Plaintiff, the court finds that the facts are not sufficient to show reckless or callous disregard for Plaintiff's rights and do not estab-

---

12. The Plaintiff's cause of action for punitive damages as contained in the Plaintiff's Third Amended Complaint reads as follows,

> Prior to plaintiff's accident on or about February 8, 2005, aboard the barge HT–39 the salvage master employed by defendant TITAN MARITIME, LLC was warned by defendant and tugboat operator AMERICAN MARINE CORPORATION that it was unsafe to moor barge HT–39 to the offshore side of the grounded vessel M/V CAPE FLATTERY which was in Hawaii State waters approximately one mile from shore off Barbers Point, Hawaii. The TITAN MARITIME, LLC salvage master categorically rejected the warning and responded with the phrase 'That's why we have insurance' or words to that effect. The mooring failed

when barge HT–39 was pushed violently into the offshore side of the M/V CAPE FLATTERY and plaintiff MICHAEL KAHUMOKU fell over the side of the barge and his leg caught in a mooring line causing plaintiff to dangle over the side of the barge. The conduct of the TITAN MARITIME LLC salvage master indicated a conscious indifference to the consequences and his intentional and/or wanton and reckless conduct amounted to a conscious disregard of the rights of others and gives rise to an action for punitive damages under Hawaii state law and admiralty law. Plaintiff MICHAEL KAHUMOKU is therefore entitled to recover punitive damages against defendant TITAN MARITIME, LLC.

Pl's. Third. Am. Compl. ¶ 13.

lish gross negligence, actual malice, or criminal indifference on the part of Titan.

As a starting point, the court notes that a salvage operation undertaken to rescue a reefed ship is, by its very nature, highly dangerous. In the present instance, the weather and ocean conditions understandably made for a difficult salvage attempt. Moreover, this was not an endeavor that could be easily delayed until conditions improved: The *Cape Flattery* salvage operation was a particularly urgent affair, its exigency stemming from the quest to avoid the environmental catastrophe sure to result should the *Cape Flattery* spill its cargo, including 53,000 gallons of cement and 117,000 gallons of fuel and lubricants, into Hawaii's coastal waters. Thus, the baseline for what is considered sufficiently reckless, grossly negligent, or wanton behavior must be considered in context, taking into account the high-risk and oft-dangerous world of urgent marine salvage operations. The court assesses Habib's actions and Titan's ultimate culpability in light of these circumstances.

The Plaintiff argues that Habib showed reckless indifference to the Plaintiff's well-being by proposing a course of action that included off-loading the cement cargo from both sides of the *Cape Flattery,* including the exposed port or windward side. While Habib's proposed plan of action might appear imprudent in the ordinary course of human affairs, viewed in light of this particular salvage operation, the plan itself is not grossly negligent, reckless, indifferent, or wanton. Although it is true that certain individuals advised Habib against attempting to land the barge on the port side, the proposed procedure is not, in and of itself, so reckless as to justify punitive damages. In the first place, Habib's plan was ap-

proved by the Unified Command. In the second place, although certain Healy Tibbits employees expressed reservations about the procedure, they nonetheless placed two of their land-based employees on Barge HT–39, including a welder in his first month on the job and on his first sea-based trip. The risk of serious harm to the Plaintiff was not so readily obvious to Habib that forwarding a dual-side offloading plan constituted such a failure of care as would justify an award of punitive damages.

Plaintiff next claims that Habib was recklessly or wantonly indifferent to the risk of serious bodily harm when he asked AMC to arrange for its captains to skipper their tugs to the *Cape Flattery* site, examine the existing conditions, and determine whether it was possible to moor a barge on the port side. Merely requesting that AMC travel to the site and consider whether it would be possible to offload cargo from both sides is not reckless or grossly negligent. Instead, Habib merely was asking others, specifically highly skilled AMC tugboat captains, to assess whether the plan of action he had proposed, and which had been approved by the Unified Command, was possible on the day in question.

Plaintiff also argues that Habib exercised decision-making authority or control and that, as such, Habib and Titan should be held ultimately responsible for Cooper's attempts to moor Barge HT–39 on the *Cape Flattery's* exposed port side. The court rejects such a claim. Both Habib and Williams agreed that Burnett and Cooper, as captains of the tugboats, would make the ultimate call as to whether to attempt the landing.[13] The record fully

---

13. All of the participants, including Habib, viewed it as the accepted and expected norm for the final decision regarding an attempted landing to be prerogative of the tugboat captains. For example, Hutchinson notes that he "told Paul [Burnett] that it was my opinion

supports that Cooper understood that the decision whether to attempt a landing on the port or windward side of the *Cape Flattery* was his alone—and not Habib's—to make. Cooper also knew that he had the full support of his AMC supervisors, including Burnett and Williams, to decline to make the landing.

The Plaintiff responds that even if Habib did not have direct decisionmaking authority or control, Habib recklessly and wantonly pressured Cooper into making the landing and should thus be held responsible for Cooper's eventual actions. In support of this claim, the Plaintiff points to Williams' testimony alleging that Habib insinuated that Titan would release AMC from the job if it did not make the port-side landing. However, Williams admits that Habib did not ever explicitly state or even impliedly state any such threat. More to the point, the record does not indicate that Cooper was ever aware of any insinuated threat. Nor could Habib have pressured or intimidated Cooper directly since the two never spoke. Further undermining the Plaintiff's argument is the fact that AMC was an independent contractor and as such was neither beholden to Titan, nor under its control. Indeed, Williams questioned Habib's qualifications, making it unlikely that Williams would have ever deferred to Habib's decision-making authority when it came to AMC's salvage efforts and the safety of AMC personnel.[14] Ultimately, while Cooper may have felt "influenced" to attempt the landing, he himself admits that no one was pressuring him to do something that he didn't want to do.

Finally, the Plaintiff argues that Habib demonstrated conscious disregard for the Plaintiff's safety by stating that he was not concerned about harm to the ships and that Titan had insurance to cover such damage. Under the Plaintiff's theory, calculated acceptance of harm to the physical structure of the ships is the equivalent of wanton or reckless disregard of the Plaintiff's wellbeing. The court declines to accept this theory. In the highly dangerous world of emergency marine salvage operations, physical damage to ships is sometimes inevitable. Acknowledging this reality, however, does not evince a lack of care for human safety or well-being. A statement recognizing the inherent risk of ship damage and attempting to assure Williams that such damage was an acceptable risk in the race to extricate the *Cape Flattery* is not equivalent to displaying a cavalier or uncaring attitude regarding the far more grave consequences of serious bodily harm. This is especially true in light of the facts on the record which suggest that not only did Titan not request that the Plaintiff or other Healy Tibbits employees be placed on the HT–39 barge, but that their presence was against Titan's work plans and Healy Tibbits' regulations. The Plaintiff therefore is asking the court to infer that Habib's willingness to risk physical damage to the ships evinces a cold-hearted indifference to injuring humans he did not know would be on board. The court is unwilling to make such liberal inferences; in its view, doing so would stretch the meaning of Habib's statements beyond their reasonable limits.

The court therefore finds that the Plaintiff has failed to allege facts sufficient to

---

that he and Scotty [Cooper], as Captains of their tugs had final say on matters regarding the safety of their vessels." Pl's. Resp. to Def. Titan's Concise Statement of Material Facts Ex. 4 at Ex. 7 pp. 302.

**14.** Williams stated that Habib "never explained ... what his qualifications for being on that ship were, and [Williams] never, to this day, understood them." Titan's Mot. Summ. J. Ex. J at 40.

sustain a claim for punitive damages against Titan.

## V. *CONCLUSION*

Titan is entitled to summary judgment as to the second claim in the Plaintiff's Third Amended Complaint. Titan's Motion for Summary Judgment as to the issue of punitive damages is thus GRANTED.

IT IS SO ORDERED.