PRESENT: Kinser, C.J., Lemons, Millette, Mims, McClanahan, and Powell, JJ., and Koontz, S.J.

EXXON MOBIL CORPORATION

OPINION BY

v.   Record No. 111775        JUSTICE LEROY F. MILLETTE, JR.
                              JANUARY 10, 2013

CONNIE MINTON, EXECUTOR OF THE
ESTATE OF RUBERT E. MINTON

FROM THE CIRCUIT COURT OF THE CITY OF NEWPORT NEWS
Timothy S. Fisher, Judge

This appeal arises out of a jury verdict against Exxon

Mobil Corporation (Exxon) based on injuries that Rubert E.

Minton suffered as a result of developing mesothelioma from

exposure to asbestos while working on Exxon ships during his

employment at the Newport News Shipbuilding and Dry Dock

Company (Shipyard).

On appeal, Exxon assigns error to: (1) the circuit court's

finding that the evidence was sufficient to show that Exxon

either actively controlled Minton's work or that Exxon failed

to intervene to protect him in the face of actual knowledge

that the Shipyard was ignoring an obvious risk to his safety;

(2) the circuit court's finding that the evidence was

sufficient to show that Minton's mesothelioma was proximately

caused by Exxon's breach of a maritime law duty; (3) the

circuit court's exclusion of all evidence that the Shipyard

knew of the relevant hazard and had asbestos controls in place;

and (4) the award of punitive damages.  For the reasons stated herein, we reverse and remand.

## I. Facts and Proceedings

Minton was employed at the Shipyard from 1956 until 1993, except for two years spent in the Army Reserves.  From 1956 to 1960, Minton worked as an apprentice shipfitter in the construction of new ships.  When he returned from the Reserves in 1962, he worked as a shipfitter and became a supervisor of other shipfitters.  During this time period Minton worked on the construction of new vessels and never worked aboard any Exxon vessels.  He was regularly exposed to asbestos from asbestos-containing materials as well as from asbestos dust from a dusty worksite and does not claim that Exxon is liable for this asbestos exposure.

In 1966, Minton was promoted to ship repair staff supervisor and was responsible for supervising and coordinating the repair of vessels.  As the position did not involve hands-on participation in the vessels' repair work, Minton did not personally handle asbestos products.  Nonetheless, Minton spent approximately half of his day walking through vessels on which repairs were being made with each vessel's repair supervisor or port engineer, to start new jobs and to inspect the repair work that was being done or that was recently completed.  During these inspections, Minton and the ship's port engineer viewed

2

various rooms in which asbestos was used, including the boiler and engine rooms.

Between 1966 and 1977, Exxon frequently brought their vessels to the Shipyard's facilities for repair. Over Minton's eleven years as repair supervisor, Exxon owned seventeen of the approximately two hundred vessels repaired by the Shipyard.

In 2009, sixteen years after the conclusion of his employment with the Shipyard, Minton was diagnosed with malignant mesothelioma, a form of cancer caused by exposure to asbestos. Minton filed suit against Exxon under the federal Longshore and Harbor Workers' Compensation Act (LHWCA), 33 U.S.C. § 905(b), for failure to warn Minton of, and protect him from, the dangers associated with asbestos. The jury found in favor of Minton and awarded him $12,000,000 in compensatory damages, $430,963.70 in medical expenses, plus punitive damages in the amount of $12,500,000. Exxon's motions to set aside the verdict, for a new trial, and for remittitur were denied, except that the punitive damage award was reduced to $5,000,000, the amount sought in Minton's ad damnum clause. Exxon timely filed its appeal.

## II. Analysis

A. <u>Sufficiency of the Evidence to Show Duty of Care</u>

Exxon first challenges the sufficiency of the evidence to establish that it violated the requisite duty of care. We

3

review the sufficiency of evidence on appeal by "examin[ing] the evidence in the light most favorable to . . . the prevailing party at trial, and the trial court's judgment will not be disturbed unless it is plainly wrong or without evidence to support it." Nolte v. MT Tech. Enters., LLC, 284 Va. 80, 90, 726 S.E.2d 339, 345 (2012) (internal quotation marks omitted); see also Code § 8.01-680.

Under 33 U.S.C. § 905(b) of the LHWCA, a vessel owner must use ordinary care in maintaining the vessel and its equipment so that an expert and experienced stevedore can load and unload cargo with reasonable safety. Included under the protection of the LHWCA are ship repairmen and shipbuilders. 33 U.S.C. § 902(3). Under the version of the LHWCA in effect prior to 1972, liability could be imposed upon a vessel owner by showing either that the vessel owner negligently caused the worker's injuries, or that the vessel itself was unseaworthy. Green v. United States, 700 F.Supp.2d 1280, 1296 (M.D. Fla. 2010). Unseaworthiness did not require a showing of fault by the vessel owner, because the creation of an unsafe condition was enough to create liability. Id. In 1972, Congress amended the LHWCA to "shield shipowners from strict liability," imposing a negligence standard and removing the ability of a worker to bring a claim against the vessel owner for unseaworthiness. Id. (internal quotation marks omitted); see also LHWCA

4

Amendments of 1972, Pub. L. No. 92-576, 86 Stat. 1263 (codified as amended at 33 U.S.C. § 905(b)).  As a result, an injured worker seeking to sue a vessel owner must now show that the owner of the vessel "violated a duty owed to the injured worker" before liability can be established under the Act. Lormand v. Superior Oil Co., 845 F.2d 536, 541 (5th Cir. 1987).

In Scindia Steam Navigation Co. v. De Los Santos, 451 U.S. 156 (1981), the United States Supreme Court established the standard of care owed by a vessel owner to shipyard workers such as Minton under the current version of the LHWCA.  The three separate duties set forth in Scindia have been termed the "turnover duty," the duty of "active control," and the "duty to intervene."  Howlett v. Birkdale Shipping Co., S.A., 512 U.S. 92, 98 (1994) (citing Scindia, 451 U.S. at 167-78).

Exxon argues on appeal that the evidence presented at trial was not sufficient to prove a violation of any of the duties of care established by Scindia to create liability for a vessel owner under the 1972 amendments to the LHWCA.  We disagree and conclude that the evidence was sufficient for a reasonable jury to find that both the active control duty and the duty to intervene were owed to Minton and subsequently breached.

## 1. Turnover Duty

Exxon contends that Minton waived the turnover duty, which relates to the condition of the ship at the commencement of stevedoring operations. Howlett, 512 U.S. at 98. We agree, as the turnover duty was not argued at trial, and Minton expressly withdrew his argument as to the presence of a turnover duty pre-trial.

## 2. Active Control

Under the active control duty, a "vessel may be liable if it actively involves itself in the cargo operations." Scindia, 451 U.S. at 167. Exxon argues that there was no active involvement because its supervision did not extend beyond general oversight. Using the language of the court in Dow v. Oldendorff Carriers GMBH & Co., 387 Fed. Appx. 504, 507 (5th Cir. 2010), Exxon claims that Minton was required to prove that Exxon actively controlled the "methods and operative details" of the Shipyard workers' repair work. Exxon argues that Minton provided no evidence to show that Exxon told the Shipyard workers how to complete their repair jobs on its vessels.

Exxon also contends that Minton did not present any evidence to show that Exxon employees worked with asbestos in the vicinity of Minton, with Minton's witnesses testifying only that some of the Exxon employees' work might have included work with asbestos. Exxon argues that Minton was unable to put

forward concrete evidence that any asbestos was being used in repair work without the necessary controls while Minton was on board the vessel. We disagree.

### a. Control Over Specific Activities

In order to establish the duty of active control, "the vessel must have substantially controlled or been in charge of (i) the area in which the hazard existed; (ii) the instrumentality which caused the injury; or (iii) the specific activities the stevedore undertook." Davis v. Portline Transportes Mar. Internacional, 16 F.3d 532, 540 (3rd Cir. 1994). Sufficient evidence of any one of the three components triggers the duty of active control.

Regarding Exxon's control over the specific activities that the Shipyard undertook, C. Lloyd Ware, a former estimating supervisor for the Shipyard, testified that Exxon's port engineer maintained "overall authority," leaving the Shipyard unable to tell Exxon's crew working on the vessel what to do. This exercise of authority was part of Exxon's designated procedure, evidenced by a portion of Exxon's 1974 Repair Procedures:

> The Repair Inspector[, with the assistance of the officers and crew,] has the responsibility of supervising the overhaul. He issues all necessary instructions to the shipyard foremen, inspects the work to see that it is properly done and coordinates the necessary . . . inspections.

7

Moreover, Julian Draper, the Shipyard's pipefitter foreman, explained in his testimony that the Shipyard's trade foreman would contact Exxon's chief engineer, chief mate, or port engineer after receiving the job orders for repairs on Exxon's vessels to make sure that the Shipyard's personnel understood the job order, and to assure that the job would be completed to Exxon's satisfaction. Sometimes, as Draper explained, the job orders would specifically require consultation with the chief or port engineer before a job order was commenced. When no such requirement was in place, the job repair specifications, such as the 1975 job order which was presented to the jury, nevertheless provided detailed specifications for each step of each individual repair to be completed by the Shipyard.

The evidence presented at trial as to Exxon's control over the repair work was sufficient for a reasonable jury to find that Exxon had a duty to Minton based on its control of the specific activities undertaken by the Shipyard employees.

b.    Presence of the Hazard

Not only was the evidence sufficient to show that Exxon actively controlled the activities on its vessels, but the evidence also supports the jury's finding that the hazard at issue, asbestos, was present in the areas under Exxon's control. Despite Exxon's argument that manufacturers were

using asbestos substitutes as early as 1971 because of widespread knowledge of the health risks surrounding the use of asbestos-containing materials, Minton presented evidence that Exxon's vessels contained asbestos during the period of time when Minton worked with Exxon at the shipyard.  Notably, Minton produced for the jury piecework orders for the Exxon New Orleans, the newest vessel that Minton worked on during his time as ship repair staff supervisor.  In the orders, asbestos blankets, asbestos plaster, and asbestos cloth are all listed with frequency.

Multiple witnesses, including Draper, also testified to the use of asbestos-containing materials on Exxon vessels through the mid-1970s.  Draper recounted the methods and processes of using asbestos in the Exxon vessels, stating that the use of asbestos and the methods of using asbestos was "the way you did business" on the Exxon ships during the time he worked with Minton.  The evidence was therefore sufficient to establish that Exxon had active control of the asbestos, a hazard present on Exxon vessels during the 1966-1977 period during which Minton was employed as ship repair staff supervisor.

### 3.  Duty to Intervene

The duty to intervene applies when a shipyard's judgment is "obviously improvident," and the vessel owner both "knew of

9

the defect [or hazard] and that [it] was continuing to [be] use[d]," and "should have realized the defect [or hazard] presented an unreasonable risk of harm to the longshoremen." Scindia, 451 U.S. at 175-76.  In order to establish the duty to intervene, Minton needed to show that:

> the vessel owner ha[d] (1) actual knowledge that a dangerous condition exist[ed] and (2) actual knowledge that the stevedore or independent contractor, or its employees, [could not] be relied upon to remedy the condition, and that if unremedied it [would] pose a substantial risk of injury.

Lormand v. Superior Oil Co., 845 F.2d at 542.

Exxon claims that no evidence was presented to show that any Exxon employee had actual knowledge that Minton was working amid conditions that were obviously dangerous.  Exxon argues that Minton proved only that Exxon should have known about the danger, but that this is not the standard to be applied to establish a duty to intervene.

a.   Actual Knowledge of the Dangerous Condition

The first step in establishing the presence of a duty to intervene requires an evaluation of whether Exxon had actual knowledge that a dangerous condition existed.  James W. Hammond, Exxon's director of industrial hygiene, testified that the danger of pulmonary injury to humans from asbestos exposure was known by 1934.  Dr. Neill Kendall Weaver, Exxon's associate medical director, stated in a deposition presented to the jury

10

that industrial hygienists were aware of the dangers of asbestos exposure as early as the 1930s.  He indicated that, not only did Exxon know of the danger in the 1930s, but it also took precautionary measures in its refineries to protect workers from the harmful effect of asbestos.

Dr. Weaver testified that in the 1950s he became aware that high exposures of asbestos were present in the shipbuilding industry.  According to Dr. Weaver, during the 1950s, Exxon's industrial hygienists took voyages on Exxon vessels and reported their observations, including measurements of the amount of asbestos dust present on the vessels during the voyage.

Dr. Weaver further testified that the scientific community was aware of the causal connection between asbestos and mesothelioma by 1964.  Significantly, Dr. R.E. Eckhardt, Exxon's director of medical records, attended a three-day conference in October, 1964, on the "Biological Effects of Asbestos," sponsored by the Section of Biological and Medical Sciences of the New York Academy of Sciences. The conference would later come to be known as the Selikoff asbestos conference.  When he returned, Dr. Eckhardt wrote a summary of the conference for Exxon, which was presented to the jury as evidence of Exxon's knowledge.  In this summary, after devoting five pages to the many presentations detailing the harmful

effects of asbestos exposure, Dr. Eckhart gives his own

opinion:

> I would say that this three-day conference
> clearly suggests that exposure to asbestos is a
> most serious situation [and] it is very important
> to eliminate all unnecessary exposure to asbestos
> dust in the future. . . .  Certainly this appears
> to be a problem that cannot be taken lightly, and
> certainly it would seem that very careful control
> of exposures to asbestos throughout refinery
> operations should be instituted.

(Internal quotation marks omitted.)  In his summary, he also

specifically recognized the danger asbestos posed to

bystanders, such as Minton, stating that "the foreman whose

exposure is presumably quite light does not develop asbestosis

but may in subsequent years go on to develop mesothelioma."

Not only did Minton's evidence show that Exxon was aware

that asbestos-containing products created dangerous working

conditions, Minton's evidence as discussed in Part II.A.2.b.,

supra, also established that Exxon's vessels did contain

asbestos throughout the period at issue, 1966-1977.

> b.  Actual Knowledge That the Shipyard Would Not Act,
> and That the Condition, if Unremedied, Would Pose a
> Substantial Risk of Injury

Minton also presented evidence of Exxon's actual knowledge

that the Shipyard could not be relied on to protect Minton,

thereby exposing him to the dangerous conditions present in an

asbestos-containing environment without the protection of

safety controls.  A 1972 letter from T.J. McTaggart, Exxon's

12

head port engineer, to captains and chief engineers on Exxon vessels prohibits the use of asbestos-containing materials on vessels, mandating that "[p]ersons packing the cartons . . . wear dust masks," and that "supplies of asbestos insulating materials . . . be packed in . . . sealed [boxes] and marked 'Asbestos[:] Not To Be Used On This Vessel – Do Not Open Unless A Dust Mask Is Worn.' "

Draper, the Shipyard's pipefitter foreman, testified that he did not, however, see any Exxon crew members use asbestos safety measures in the 1960s and 1970s, nor did he ever receive a warning from the Exxon crewmembers that asbestos was hazardous. Ware, the former estimating supervisor for the Shipyard, testified that at no time prior to the late 1970s did he see any signs warning against asbestos exposure or any effort by Exxon crew members to isolate areas so that the Shipyard workers would not be exposed to asbestos dust, to take air samples, or to employ wet-down methods to hold down the dust. Ware also testified that the Shipyard workers did not have showers or clean clothes provided to them when they worked around asbestos, nor did he see anyone, Exxon worker or Shipyard worker, wearing a respirator when working with or around asbestos products. Nor did he see any warnings or barriers to protect the Shipyard workers. The testimony of Dr. David Egilman, Minton's treating physician, emphasized the

13

extent of the danger created by these working conditions that existed without any warning to the Shipyard workers, analogizing the situation to a fire in a theatre to which no one speaks a word of warning.

If accepted by the jury, the evidence of Exxon's knowledge regarding the dangers of asbestos both before and during Minton's employment at the Shipyard and the Shipyard's failure to warn its workers or protect individuals such as Minton in the presence of the danger was sufficient to establish Exxon's actual knowledge of the failure of the Shipyard to take the requisite steps to protect their employees.  Thus, if Minton's evidence was accepted by the jury, it would have been sufficient for the jury to conclude that Exxon failed unreasonably to protect Minton when the Shipyard had failed to do so.

B.    Sufficiency of the Evidence to Show Proximate Cause

Exxon's second challenge is to the sufficiency of the evidence presented to establish that Exxon's breach of its duty of care caused Minton's injury.  The aforementioned standard of review for a challenge to the sufficiency of the evidence supporting a jury finding requires an "examin[ation of] the evidence in the light most favorable to . . . the prevailing party at trial" that is not to be disturbed unless "plainly wrong or without evidence to support it."  Nolte, 284 Va. at

14

90, 726 S.E.2d at 345 (internal quotation marks omitted); see also Code § 8.01-680.

In arguing that the evidence was not sufficient to support a finding of causation, Exxon claims that the inability of Minton's medical experts to testify that Minton's prior exposure to asbestos could not have, on its own, caused Minton's mesothelioma precluded a finding that Exxon caused Minton's injury. According to Exxon, because the experts testified that Minton's prior work in vessel construction was sufficient exposure to cause mesothelioma, any breach by Exxon could not be established as the cause of Minton's subsequently-diagnosed mesothelioma. Exxon argues that any finding of causation would be based on mere conjecture.

We disagree with Exxon's argument and find that the evidence was sufficient for a reasonable jury, as instructed, to find that Exxon's actions were a substantial contributing factor in causing Minton's injury. Although Minton's experts did testify that Minton's prior exposure to asbestos could have been, on its own, enough to cause mesothelioma, it is established maritime law that "an injured party [may] sue a tortfeasor for the full amount of damages for an indivisible injury that the tortfeasor's negligence was a substantial factor in causing." Edmonds v. Compagnie Generale Transatlantique, 443 U.S. 256, 260 (1979). This is true "even

15

if the concurrent negligence of others contributed to the incident." Id. Based on this principle, the jury was not precluded from finding that Minton's exposure to asbestos materials on Exxon's ships was a cause sufficient to establish liability for Minton's resulting indivisible harm.

The question before the jury was therefore whether the evidence was sufficient to show that Minton's exposure to asbestos while on Exxon's vessels was a substantial contributing factor in the development of Minton's injury, mesothelioma.[1] To answer this question, the jury was given an instruction that defined substantial, "not . . . by quantity but [by] quality[, meaning] that the exposure aboard Exxon's vessels was not an imaginary or possible factor or having only an insignificant connection with the harm."

Based on this definition contained within an uncontested instruction, the evidence regarding the presence of

---

[1] We have today rejected the substantial contributing factor analysis of proximate causation in cases tried under Virginia law when multiple sufficient causation is alleged. Ford Motor Co. v. Boomer, 285 Va. ___, ___, ___ S.E.2d ___, ___ (2013) (this day decided). In the case at bar, however, the appropriate theory of causation is not before us. At trial, the substantial contributing factor theory of causation was presented to the jury in a jury instruction without objection by either party to the case. In the absence of a contemporaneous objection, "[r]ight or wrong, the instruction given [becomes] the law of the case on that point, and [is] binding upon both the parties and the jury." Hilton v. Fayen, 196 Va. 860, 867, 86 S.E.2d 40, 43 (1955). It cannot be questioned on appeal. Id.

16

uncontrolled asbestos aboard Exxon vessels and the testimony by Minton's medical experts regarding the effect of such levels of asbestos were sufficient to support a finding of causation. As noted in Part II.A.2.b., supra, the evidence made clear that asbestos, and repairs involving asbestos, were present on Exxon vessels in the 1960s and 1970s. There was also evidence that Minton visited the Exxon ships in the course of his employment with the Shipyard, spending approximately half of every day walking through the vessels. Exxon had seventeen vessels docked at the Shipyard during the eleven year period that Minton served as ship repair staff supervisor, when Minton spent over one thousand days walking through the asbestos-containing area. The evidence shows that Minton was not protected from asbestos exposure through the use of safety controls on any of those days, nor that he was aware of the risk.

The testimony also included the details of daily repairs, including a description of work on asbestos-containing areas of the engine rooms of a vessel, which would include asbestos insulation being "thrown on the deck," after which cleaners would sweep the material, allowing the dust particles to repeatedly fly into the air. Evidence was also presented regarding the "taking out of valves" on the vessel, which would, on a "case-by-case basis" require the removal of

17

asbestos insulation to reach the valve.  Based on this testimony and the extensive lists of asbestos-containing materials installed on the vessels, there was sufficient evidence to support a finding of significant asbestos exposure to Minton, who was frequently present on the ships while repairs were being completed.

Dr. Egilman and Dr. John Coulter Maddox, a pathologist who has studied asbestos-related disease since the 1970s, testified as to the link between the prevalence of asbestos on Exxon's vessels and the injury to Minton.  Both Dr. Egilman and Dr. Maddox opined that the exposure to asbestos on Exxon's vessels when work was performed on pumps insulated with asbestos materials was a substantial contributing factor in Minton's injury.  Dr. Egilman opined that such work caused fibers of asbestos to circulate around the vessel, reaching bystanders at the time of repair.  Dr. Egilman attributed Minton's injury, at least in part, to his exposure as a frequent bystander during the repair work.

Based therefore on the evidence of asbestos-containing materials on the Exxon vessels in the 1960s and 1970s, Minton's daily exposure to the asbestos, and the danger present in such exposures, we agree with Minton that there was sufficient evidence for a reasonable jury to find that Exxon's actions were a substantial contributing factor in Minton's injury.

18

C.   Exclusion of Evidence on the Shipyard's Knowledge

Exxon also assigns error to the circuit court's exclusion of evidence regarding the Shipyard's knowledge of the danger of asbestos exposure and its policies in place to protect the Shipyard workers from the hazard.  Exxon contends that, due to the court's denial of its requests to introduce evidence about the Shipyard's knowledge and safety measures, the jury was given the false impression that Exxon had unique knowledge and was therefore the only actor with the ability to protect Minton from harm.  Exxon argues that this error was highly prejudicial and therefore warrants reversal.

Minton contends that the evidence is not relevant.  He argues that the sole purpose for admitting evidence of the Shipyard's knowledge of the danger of exposure to asbestos-containing materials was to direct blame at a statutorily immune employer.[2]  Furthermore, even if attributing blame to the immune Shipyard was permitted, Minton claims that it would not be relevant to Exxon's duty of care.  Minton argues that the two elements he needed to prove were that the Shipyard's conduct was obviously improvident and that Exxon did nothing to remedy it.  As the Shipyard's knowledge was not relevant to

---

[2] The Supreme Court has held, consistent with the Congressional intent underlying 33 U.S.C. § 905(b), that no attribution of liability may be made, either directly or indirectly, against a longshoreman's statutory employer.  Edmonds, 443 U.S. at 263, 270 n.8.

either of these two elements of proof, Minton contends that it was properly excluded.  We disagree.

When reviewing the discretionary exclusion of evidence by a trial court, the decision "will not be overturned on appeal absent evidence that the trial court abused [its] discretion." May v. Caruso, 264 Va. 358, 362, 568 S.E.2d 690, 692 (2002) (citation omitted).  An abuse of discretion can occur when "a relevant factor that should have been given significant weight [was] not considered."  Landrum v. Chippenham & Johnston-Willis Hosps., Inc., 282 Va. 346, 352, 717 S.E.2d 134, 137 (2011) (internal quotation marks omitted).

As described in Part II.A., supra, the 1972 amendments to the LHWCA as interpreted by the Supreme Court of the United States in Scindia established the standard of care owed by a vessel owner to an injured worker.  The three duties are the aforementioned "turnover duty," duty of "active control," and "duty to intervene."  Howlett, 512 U.S. at 98; see also Scindia, 451 U.S. at 167-78.

The turnover duty is violated by the actions of the vessel owner, applicable when the owner fails to turn the vessel over free of "hidden dangers" and without any warning of dangers that do exist.  Scindia, 451 U.S. at 167.  The second duty, the active control duty, is also based on the vessel owner's actions.  It is violated if the vessel owner fails to "exercise

20

reasonable care to prevent injuries to longshoremen in areas that remain under the active control of the vessel." Howlett, 512 U.S. at 98 (internal quotation marks and citation omitted). The duty to intervene, the third duty, requires that the vessel owner have "actual knowledge that an unsafe condition exists and that the stevedore is allowing that condition to continue," leaving the vessel owner under a duty to intervene if the stevedore, or shipyard, is "obviously improvident" in failing to remedy the danger. Elberg v. Mobil Oil Corp., 967 F.2d 1146, 1150 (7th Cir. 1992) (internal quotation marks and citation omitted).

Although all three duties are based in whole or in part on a vessel owner's acts or omissions, the duty to intervene stands alone in relying in part on the acts or omissions of the plaintiff's employer in improvidently allowing an unsafe condition to go unremedied. In order for a jury to determine whether the evidence was sufficient to show that the vessel owner unreasonably failed to intervene in the face of a shipyard's failure to act, evidence is admissible to show that there was a basis for the vessel owner not to rely on the shipyard to provide the necessary protective measures. This is a crucial consideration because the shipyard has the duty to "provide a reasonably safe place to work and to take safeguards necessary to avoid injuries," and a vessel owner may rely upon

21

the shipyard's concomitant responsibility to avoid exposing its employees to unreasonable hazards.  Howlett, 512 U.S. at 101 (citing Scindia, 451 U.S. at 170); see 33 U.S.C. § 941.  The vessel owner can rely upon the shipyard's "expertise and reasonableness," Duplantis v. Zigler Shipyards, Inc., 692 F.2d 372, 374 (5th Cir. 1982), as the shipyard is "in the best position to avoid accidents during cargo operations."  Howlett, 512 U.S. at 101 (internal quotation marks omitted).  The shipowner has "justifiable expectations that those duties" will be performed by the repair company without the shipowner's supervision.  Scindia, 451 U.S. at 176.

In order to establish a vessel owner's duty to intervene, a jury must be able to consider evidence of the employer's knowledge of the danger and ability to protect the employee. Until it is shown that the employer, who is presumed to have a higher level of expertise than the vessel owner, lacked the knowledge, intent, or ability to protect the employee, no duty to intervene can be attributed to the vessel owner, who "has no duty to anticipate inaction or carelessness of a ship repairer."  Bergeron v. Main Iron Works, Inc., 563 So.2d 954, 957, 959 (La. Ct. App. 1990) (citation omitted).  It is only if there is sufficient evidence that the vessel owner could not rely on the employer or its expertise that the vessel owner, "if it has actual knowledge, is required to overrule the ship

22

repairer's judgment and correct the hazard."  Id. (citation omitted).

The circuit court found the Shipyard's knowledge of the danger of exposure to asbestos and its ability and intent to remedy that danger irrelevant.  We hold, however, that evidence tending to show the Shipyard's knowledge of the danger and its ability and intent to remedy the danger is relevant in the determination of whether Exxon had a duty to intervene to protect Minton.  Exxon's proffered evidence of the Shipyard's knowledge, intent, or ability to protect Minton through programs created by the Shipyard included:  annual physicals for workers, the use of respirators when working with insulation projects, and the application of wet-down techniques to keep asbestos fibers from becoming airborne.  Such evidence was relevant to the jury's determination of whether the existence of these programs supported Exxon's argument that it had no duty to intervene because Exxon would have been acting reasonably in relying upon the Shipyard to adequately protect the Shipyard's own workers.

We therefore hold that the trial court erred in refusing to admit evidence of the Shipyard's knowledge of the dangers of asbestos exposure and its procedures regarding precautions to be taken around asbestos, whether or not implemented.  Although we have determined that the evidence that Minton presented, if

23

accepted by the jury, was sufficient to support a verdict for Minton based upon a violation of Exxon's duty to intervene, we cannot say that the jury would still have concluded that Exxon violated the duty if it was presented with the excluded evidence. Whether Exxon violated its duty to intervene was one of the two potential bases for the verdict in favor of Minton. Because we cannot determine from the record whether the jury found in favor of Minton based upon the duty to intervene without the opportunity to consider the excluded evidence, or because of Exxon's violation of the active control duty, we will reverse the judgment of the circuit court.

### D. Punitive Damages

Finally, Exxon challenges the award of punitive damages, basing its argument on the language of 33 U.S.C. § 905(b), which it argues forecloses the remedy. Exxon contends that, by stating that the allowance under the LHWCA for recovery against a vessel owner for negligence is "exclusive of all other remedies against the vessel," 33 U.S.C. § 905(b), the statute eliminates the ability of a court to supplement the statute's provided remedies.

Minton argues that the award of punitive damages was not contrary to the statutory language of 33 U.S.C. § 905(b), which he claims does not address damages at all. Without any express language departing from the common law understanding, Minton

24

argues that the common law must be applied.  As a result, Minton contends that punitive damages, which were available at common law and have been extended to federal maritime claims, should be affirmed in the case at hand.

We recognize that a number of courts have allowed punitive damages in accordance with Minton's reading of the statute, holding that 33 U.S.C. § 905(b) is silent as to availability of punitive damages.  See, e.g., Kahumoku v. Titan Mar., LLC, 486 F.Supp.2d 1144, 1151 (D. Haw. 2007) (finding the language of 33 U.S.C. § 905(b) silent "as to punitive damages[,] indicat[ing] Congress' intent for the remedy to remain available under maritime law"); Wheelings v. Seatrade Groningen, BV, 516 F.Supp.2d 488, 496 (E.D. Pa. 2007) (stating that "[because] the LHWCA is silent on the availability of punitive damages, the court follows general maritime law").

We reject this interpretation of 33 U.S.C. § 905(b) as contrary to the statute's plain language.  In making this determination, we review this question of law de novo.  David White Crane Serv. v. Howell, 282 Va. 323, 327, 714 S.E.2d 572, 575 (2011).  The Supreme Court of the United States has established that "the general rule that punitive damages were available at common law extended to claims arising under federal maritime law."  Atlantic Sounding Co. v. Townsend, 557 U.S. 404, 411 (2009).  This remedy was applied with frequency

25

in lower federal courts "for tortious actions of a particularly egregious nature," thereby establishing itself as a recognized and often-applied remedy. Id. at 411-12. Accordingly, the common law remedy of punitive damages in the context of federal maritime law claims can be denied only if "Congress has enacted legislation departing from this common-law understanding." Id. at 415.

The LHWCA constitutes legislation that explicitly departs from the general rule under common law that punitive damages are an available remedy in federal maritime law claims. The language of 33 U.S.C. § 905(b) states, in relevant part:

> In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party in accordance with the provisions of section 933 of this title. . . . The remedy provided in this subsection shall be exclusive of all other remedies against the vessel except remedies available under this [Act].

(Emphasis added.) The plain language of the statute clearly limits the remedies available for a negligence action under the LHWCA to those included within the terms of the statute. We have previously held that "[w]here the legislature has used words of plain and definite import the courts cannot put upon them a construction which amounts to holding the legislature did not mean what it has actually expressed." Barr v. Town &

26

Country Props., Inc., 240 Va. 292, 295, 396 S.E.2d 672, 674 (1990). Consequently, as punitive damages are not a remedy made available within the terms of the LHWCA, and the language plainly restricts the damages to those remedies explicitly made available, they are extinguished as a category of recovery in LHWCA claims. See Miller v. American President Lines, Ltd., 989 F.2d 1450, 1457 (6th Cir. 1993) (stating that "[t]his statute creates a worker's compensation scheme for certain maritime workers which is exclusive of other remedies and does not provide for punitive damages"); McConville v. Reinauer Transp. Cos., 835 N.Y.S.2d 711, 713 (N.Y. App. Div. 2007) (indicating that "[p]unitive damages are not available in an action brought pursuant to the LHWCA"); Welsh v. Fugro Geosciences, Inc., 804 So.2d 710, 716-17 (La. Ct. App. 2001) (recognizing the "trend in federal jurisprudential and statutory law to bar claims for nonpecuniary loss," including punitive damages) (internal quotation marks omitted).

Thus, we hold that the award of $12,500,000 in punitive damages was inappropriately granted because punitive damages are a remedy prohibited by the terms of LHWCA.

### III. Conclusion

For the aforementioned reasons, we will reverse the judgment of the circuit court based on its exclusion of relevant evidence regarding the Shipyard's knowledge of the

27

danger of asbestos exposure and its ability to remedy the danger, and remand for further proceedings consistent with this opinion.  We will also reverse the circuit court's award of punitive damages and enter final judgment as to that claim.

Reversed and remanded.

JUSTICE MCCLANAHAN, with whom JUSTICE POWELL joins, concurring in part and dissenting in part.

I agree with the majority's holdings that Minton presented sufficient evidence to prove Exxon violated the second and third Scindia duties, i.e., the active control duty and the duty to intervene.  I disagree with the majority's conclusion, however, that the trial court erred in excluding evidence of the Shipyard's purported "knowledge of the dangers of asbestos exposure and its policies in place to protect the Shipyard workers from the hazard."  In light of Minton's proof that Exxon had a duty to intervene, the Shipyard's asbestos-related knowledge and policies were irrelevant to Exxon's duty to protect shipyard workers on its ships.

I also disagree with the basis for the majority's reversal of Minton's award of punitive damages.  Title 33 U.S.C. 905(b) of the Longshore and Harbor Workers' Compensation Act (LHWCA) does not preclude as a matter of law a shipyard worker from seeking to recover punitive damages in a negligence action against a shipowner.

28

## 1. Shipyard's Knowledge and Policies

The Scindia duty to intervene is violated if the shipowner (i) fails to intervene when it knows of an unreasonably dangerous condition that has developed during the course of an independent contractor's shipboard operations; and (ii) it knows that the contractor "improvident[ly]" intends to continue those operations in the face of the danger and thus cannot be relied upon to protect its workers. Scindia Steam Navigation Co. v. De Los Santos, 451 U.S. 156, 175-76 (1981).

I agree with the majority's conclusion in Part II.A. of its opinion that Minton presented sufficient evidence to prove Exxon violated this duty based on evidence of the following: (i) Exxon's knowledge, dating back to the 1930's, of the hazards posed by asbestos exposure from asbestos-containing products like those located throughout its ships; and (ii) Exxon's knowledge that, during the eleven year period Minton worked aboard Exxon's ships, the Shipyard took no asbestos control measures, and "could not be relied on," to protect its workers, including Minton, from asbestos exposure when conducting repairs on Exxon's ships.

However, after reaching that conclusion, the majority concludes in Part II.C. that the Shipyard's asbestos-related knowledge and policies, which were excluded from evidence, were

relevant to "whether Exxon had a duty to intervene."  Those two conclusions are, in my opinion, patently inconsistent.

Evidence of such knowledge or policies of the Shipyard would not have changed the uncontroverted fact at trial that the Shipyard did not act for eleven years to protect its workers, including Minton, from the hazards of asbestos exposure when aboard Exxon's ships.  And, it was that course of Shipyard inaction that triggered Exxon's ongoing duty to intervene to protect those workers in light of the jury's necessary finding regarding Exxon's own knowledge of the hazardous circumstances.  That duty could not then be negated by Exxon pointing to evidence of what the Shipyard may have known about the hazards of such exposure, or policies the Shipyard may have had "to protect the Shipyard workers from the hazard" when no such policies were being implemented by the Shipyard.  To be relevant, evidence must have a logical tendency to prove a fact at issue in the case.  <u>Harrell v. Woodson</u>, 233 Va. 117, 122, 353 S.E.2d 770, 773 (1987).  On the facts here, the Shipyard's actual asbestos-related knowledge and policies had no logical relation to the issue of Exxon's own knowledge of the circumstances giving rise to its duty to intervene.  Exxon's proffered evidence of the Shipyard's knowledge and policies was, therefore, irrelevant relative to Exxon's duty to act.

In deciding the relevancy of the proffered evidence, the majority correctly states that a shipowner has no duty to anticipate inaction on the part of a shipyard regarding the protection of its workers. The majority further asserts, however, that no duty to intervene can be attributed to the shipowner until it is shown that the shipyard "lacked the knowledge, intent, or ability to protect" its own workers. No part of that assertion is consistent with the Scindia standard for the duty to intervene. In the face of the shipyard's inaction to protect its workers from an unreasonably dangerous condition that has developed during shipboard operations, it matters not whether the shipyard had the knowledge, intent or ability to protect its workers. In that instance, it is self-evident that the shipyard cannot be relied upon to do so, thus triggering the shipowner's duty to intervene on behalf of those workers to the extent the shipowner becomes aware of the hazardous circumstances. At that point, the fact that the shipowner initially had no duty to anticipate the shipyard's inaction is not a relevant consideration.

I would therefore hold that the trial court did not abuse its discretion in excluding Exxon's proffered evidence regarding the Shipyard's asbestos-related knowledge and policies. See John Crane, Inc. v. Hardick, 283 Va. 358, 367, 722 S.E.2d 610, 614 (2012) ("[W]e will not disturb a trial

31

court's evidentiary ruling absent an abuse of discretion."
(citation and internal quotation marks omitted)).

## 2. Punitive Damages Award

Contrary to the majority, I would hold that a shipyard worker such as Minton, i.e., a worker covered under the LHWCA (33 U.S.C. §§ 901-950), is permitted as a matter of law to seek punitive damages under 33 U.S.C. 905(b) in a negligence action against a shipowner such as Exxon.

Section 905(b), which was added by amendment in 1972, provides in pertinent part:

> Negligence of vessel. In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party in accordance with the provisions of section 933 of this title, and the employer shall not be liable to the vessel for such damages directly or indirectly. . . . The liability of the vessel under this subsection shall not be based upon the warranty of seaworthiness or a breach thereof at the time the injury occurred. The remedy provided in this subsection shall be exclusive of all other remedies against the vessel except remedies available under this [Act].

33 U.S.C. § 905(b).

Prior to 1972, a covered worker had a maritime law claim "against the shipowner if [his] injury was caused by the ship's unseaworthiness or negligence," Scindia, 451 U.S. at 164. While the addition of § 905(b) to the LHWCA by the 1972 amendments "abolished" the worker's right to recover for

unseaworthiness, "his right to recover from the shipowner for negligence was preserved in § 905(b)." Id. at 165 (emphasis added).

A " 'tort of negligence' " claim under general maritime law has been recognized " 'for more than a century.' " Atlantic Sounding Co. v. Townsend, 557 U.S. 404, 421 (2009) (quoting Norfolk Shipbuilding & Drydock Corp. v. Garris, 532 U.S. 811, 820 (2001)). At the same time, federal courts have recognized that punitive damages are "available in maritime actions for tortious acts of a particularly egregious nature." Id. at 411. See Lake Shore & Michigan Southern Ry. Co. v. Prentice, 147 U.S. 101, 108 (1893) ("[C]ourts of admiralty . . . proceed, in cases of tort, upon the same principles as courts of common law, in allowing exemplary damages . . . ."); see also Powers v. Bayliner Marine Corp., 855 F.Supp. 199, 202-03 (W.D. Mich. 1994) ("In admiralty jurisdiction, where Congress has not spoken, the general maritime law, 'an amalgam of traditional common law rules developed by the judiciary, applies.' " (quoting East River S.S. Corp. v. Transamerica Delaval, Inc., 476 U.S. 858, 864-65 (1986)).

Congress did not indicate in § 905(b), when preserving the shipyard worker's negligence action against the shipowner, that it was nevertheless excluding the right of the worker to seek punitive damages as part of that claim. Indeed, § 905(b) is

silent as to the type of damages that may be recovered; it merely states: "In the event of injury to a person covered under this Act caused by the negligence of a vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel[.]"

Furthermore, the House Report accompanying the 1972 amendments to the LHWCA did not give any such indication. The House Report stated that "nothing in this bill is intended to derogate from the vessel's responsibility to take appropriate corrective action where it knows or should have known about a dangerous condition." H.R. Rep. No. 92-1441 (1972). The House Report then explained that the issue of whether the vessel was negligent "can only be resolved through the application of accepted principles of tort law and the ordinary process of litigation - just as they are in cases involving alleged negligence by land-based third parties." Id. (Emphasis added.)

We are also aided in our construction of § 905(b) by a long-standing principle of statutory construction under federal law: "No statute is to be construed as altering the common law, farther than its words import." Shaw v. Railroad Co., 101 U.S. 557, 565 (1879). Reflective of this principle, the United States Supreme Court recently held in Townsend that punitive damages are available under general maritime law except where

they have been eliminated by "legislation departing from [the] common-law understanding" that punitive damages extend to maritime claims.  Townsend, 557 U.S. at 414-15.  Consistent with Townsend, at least one federal court addressing the instant statutory construction issue has held that punitive damages are allowable under § 905(b).  Kahumoku v. Titan Mar., LLC, 486 F.Supp. 2d 1144, 1151-52 (D. Haw. 2007).  See also Thomas J. Shoenbaum, Admiralty and Maritime Law § 5-10 at 439-40 (5th ed. 2012) (indicating that punitive damages are allowable under § 905(b)).

The majority points to the last sentence of § 905(b) as the basis for concluding that punitive damages are precluded under this subsection as a matter of law.  Without dispute, the last sentence of § 905(b) does limit a covered worker's "remedy" against a shipowner to a negligence action.  That sentence expressly states: "The remedy provided in this subsection [a negligence action] shall be exclusive of all other remedies against the vessel except remedies available under this Act."  But that language does not limit in any way the damages that the covered worker may seek when bringing his negligence tort action against the shipowner.  A statutory "restriction on the remedies available" to an injured party is not a restriction on "damages."  Kosar v. Chesapeake and Ohio Rwy. Co., 449 F.2d 1238, 1240 (6th Cir. 1971).  "There is an

35

important distinction between a 'remedy' which Bouvier's Law Dictionary defines as 'the means employed to enforce a right or redress an injury,' and 'damages' which are defined as 'the indemnity recoverable by a person who has sustained an injury . . . and the term includes not only compensatory, but also exemplary or punitive or vindictive . . . damages.' " Id.  It is thus a "misuse of the legal terminology" to refer to punitive damages as a remedy or right of action.  Id.

Section 905(b) does not contain language that should be construed as an explicit departure from the common law tradition of allowing a party to pursue punitive damages in a maritime claim; and the legislative history, in fact, indicates that courts are to continue to adhere to the common law of torts in adjudicating such claims under § 905(b).  I would accordingly allow Minton to seek punitive damages upon the remand of this case for further proceedings if he be so advised.